By the Court.
Mason, J.
This case is one of considerable interest, and has been argued at great length, and with *320 distinguished ability by the counsel on both sides. It derives its importance, however, more from the large amount in controversy, the character of the parties, and the nature of the charges brought against the defendants, than from the intrinsic difficulty of the legal questions on which our decision will be found to rest.
The first question to be settled is, as to the relation which subsisted between the Messrs. Astor and the intestate. Was Mr. Ogden a partner with the Astors in the Canton business, or was he merely their servant or agent ? The defendants insist he was the latter, while the plaintiff strenuously contends he was the former. Upon the answer to this questiojn the rights of the parties in some important particulars depend. The only evidence on this point is the letter of Mr. Astor, Senior, to Mr. Ogden, under date of Oct. 2, 1816, which, with the acknowledgment and promise of the latter to comply with its terms, appears to have constituted the agreement between them.
It is urged by the defendants that this letter contains many details entirely inconsistent with the idea of a partnership — that the writer repeatedly uses the expression, “ my business” — that the terms of the arrangement were all dictated by him — that Mr. Ogden was precluded from entering into any business except such as Mr. Astor should confide to him, and commission business — and that he was to receive one-fifth of the net profits, expressly in consideration of his making no charge for the transaction of his (Astor’s) business, “and in lieu and stead thereof.” That therefore the allowance of one-fifth of the profits was in the nature of a compensation for his services, and did not confer on him the rights, or subject him to the responsibilities of a partner.
With regard to the expression “ my business,” it is such as would naturally be used by a person in Mr. Astor’s situation, if he had already established a business in Canton, or was about to commence it with so large a capital as half a million of dollars, especially as the other party was not to contribute any thing to the common stock beyond his capacity, industry, and integrity. And on the assumption that the business had been *321 Mr. Astor’s previously, the expression is no evidence that he did not intend to admit Mr. Ogden into a participation of its benefits as a partner. It is as if he had said, though this is now my business exclusively, yet from this time it shall be our joint business.
The objection that Mr. Astor dictated the terms, proceeds on the assumption that this was the first proposal made on the subject, and that Mr. Ogden was reduced to’ the alternative of a simple acceptance or refusal of the proposition; whereas it may just as fairly be assumed that the matter had been fully discussed between the parties, and that the letter only expresses the result of those discussions. Indeed, the letter itself implies as much. It commences with a reference to several conversations which they had held together on the subject, and states that he understands from those conversations the several propositions to have been assented to which he proceeds to give in detail. But even were it not so, and the letter was the first proposition made to Mr. Ogden, yet if it is in fact a proposition for a partnership, the circumstance that its terms were all suggested by one of the parties cannot affect its nature. Considerations of this kind may throw light on their previous relative position, but their actual relations can only be determined by the contents of the written paper. Neither is there any force in the objection that Mr. Ogden was restricted from entering into any other business except commission business. Mr. Astor was himself subject to the same restriction with regard to business to Canton.
The only plausible argument in favor of the agreement constituting Mr. Ogden an agent merely and not a partner is, that part which states that he was to receive one-fifth of the net profits “ on consideration,” to use Mr. Astor’s words, “ of your making no charge for the transaction of' my business.” For it, is well settled that a participation by a party in the profits of any business, simply as a compensation for his labor or services, without having any interest in the principal stock, or in the profits as such, or any right to control the business, does not make him a partner. He must have a right to the profits as *322 profits, i. e., as the result of the capital and industry in which ■both are interested, and not as a measure of compensation merely, and be liable for losses; he must have an interest in the stock with the right of control, or he is not a partner. (Collyer on Part. §§ 25, 45, and notes, 3d Am. Ed.)
Let us then, with this distinction in view, examine the provisions of this agreement.
1. Mr. Ogden was authorized, in addition to the business to be sent him by Mr. Astor, to do such commission business as might offer itself to him, and such as Mr. Astor might recommend, and of the commissions arising from all such business Mr. Astor ■was to receive four-fifths and Mr. Ogden one-fifth. From the nature of -the case, he must have controlled and directed this business, and ;could not in the management have been subject to the control or direction of Mr. Astor.
2. He was at liberty to purchase, contract, or speculate in ■goods at Canton to the amount of $100,000 per annum ; these contracts or speculations were to be for joint account and risk of himself and Astor — “ one-fifth,” says Mr. Astor, “ for you, and four-fifth parts gain or loss to me” — and the intention is ■afterwards stated to be “ to buy goods when cheap for our own use." Language could hardly express in clearer terms the interest of both parties in the goods, and -their mutual participation in the profit and loss which might arise upon them.
3. Again, it is stipulated that the whole of the net profits were to remain in the trade, except the sum of $2000 per annum, which it was agreed should be paid out of Ogden’s share of the profits to his order in New York. This was-a perfectly reasonable stipulation if a copartnership was formed between the parties, as it might be the means of increasing the capital and thus rendering the business more valuable; but for a principal to insist that his clerk or agent should keep his wages or compensation for his services, in the trade for five years for the benefit of his- principal, would have been rather an unusual demand. Besides, no provision was made for interest on these profits thus to be left in the trade, — a provision immaterial on the idea of a partnership, but of great importance to an agent.
*323 4. Mr. Astor was also to credit to tbe account of “ this business” all commissions which- he might receive arising from consignments made to him from Canton, and the parties were to render to each other, annually, regular accounts of the transactions and business alluded to.
It is very manifest from all these provisions that Ogden had an interest in the stock and property of the concern, and in the profits as such, and that he was to exercise a control in the management entirely inconsistent with the situation of a servant or agent. And so the parties themselves understood the matter. The account rendered by the Messrs. Astor to the representatives of Mr. Ogden on the 27th September, 1826, was made up on the principle of a partnership account. It charged him with losses on various adventures, gave him credit for profits on others, and brought him in debt in the sum of $9620.16, which it claimed to be the balance due on 31st July preceding; all which could not have been done had. he not been considered as a partner.
The next question is whether the plaintiff is not too late in his suit ?
Mr. Ogden died in 1823. The account was rendered to his administrators in August, 1826. .The bill was filed in January, 1842. Upwards of fifteen years then elapsed between the rendering of the account and the filing of the bill.
As to some portions of the claim, that which relates to the Beaver and the Henry Astor’s fourth voyage, no account was ever rendered until called for by the bill in this cause.
Is it a case, then, in which a court of law would have concurrent jurisdiction with a court of equity, so that it is governed by the statute of limitations ? And if not, is the plaintiff barred by force of the rules adopted by courts of equity where their jurisdiction is exclusive in relation to stale demands ?
These questions were much discussed at bar, and we proceed to consider them. It was conceded that no action at law but the action of account could have been maintained, and much learning and research were .displayed by the counsel on both *324 sides, on the point whether an action of account would lie by one partner against another partner.
It is undoubtedly laid down by Yiner, (Tit. Account, E. §§ 2 and 3,) that where two merchants have goods in common, the one cannot bring account against the other, and he refers to the Year Book 11 Henry IY. fol. 79, as authority. But Eitzherbert holds directly the' contrary. He says, (E. N. B. 117 D.,) “If two merchants occupy their goods and merchandise in common, and to their common profit, one of them shall have an action of account against the other in the county court or in the court of common pleasand he gives the form of a writ in such case in the county court.
Lord Coke is to the same effect, (Co. Litt. 172 a.) “ If two joint merchants,” he says, “ occupy their goods and merchandise 'in common to their common profit, one of them naming himself a merchant, shall have an account against the other, naming him a merchant, and shall charge him as receptor denariorum, &c.” The case of Hartwell and Wife v. Eastman, (Cro. Jac. 410,) is an authority in support of the position of Lord Coke. It was an action by the executors-of a deceased partner, against one of the surviving partners, in which the deceased partner was styled a merchant, and an account was demanded from the defendant of the third part of the goods, &c., which he had held for the common benefit of the three. After verdict, a motion was made in arrest of judgment, not on the ground that an action would not lie between partners, but that the plaintiff should have demanded for the whole account and joined the other partner with him ; but the action was sustained.
The legislature of this state, in the revision of 1830, assumed that the action would lie, for they provide for the mode of proceeding when an action of account should be brought, “by one or more partners against another partner;” (2 R. S. 385;) and from the case of. McMurray v. Rawson, (3 Hill, 59,) it would seem that the action could have been sustained in this state, before the adoption of the code, between two partners, where the partnership was a mercantile one. The point was expressly decided by Chancellor Kent, in Duncan v. Lyon, (3 J. C. R. 360,) and by the Yice-Chan *325 eellor M’Coun, in Atwater v. Fowler, (1 Edw. Ch. R. 417,) and the statute of limitations was in the latter case applied entirely on that ground. If Ogden himself could have maintained the action, his representatives could also, by virtue of the fifth section, of the act concerning executors and administrators, and the distribution of intestates’ estates, passed April 6th, 1813, (1 R. Laws, 311,) which provides that actions of account may be brought by and against executors and administrators in all cases in which the same might have been brought by or against their respective testators or intestates.
But here the question arises, whether, if the action of account is maintainable by one partner against another when they are merchants, and the accounts have regard to their merchandise, the case does not fall within the exception of the statute. It reads thus: That all actions upon the case and of account, other than actions for slander and actions which concern the trade of merchandise between merchant and merchant, their factors and servants, Sc., shall be commenced within -six years. (1 R. L, 186, § 5.)
The exception in the English statute is “other than such accounts as concern the trade of merchandise,” and the court of exchequer in Inglis v. Haigh, (8 Mees. & Welsby, 769,) while they held that at laws! the exception was confined to actions of account between merchant and merchant or a merchant and his factor concerning the trade of merchandise, and did not apply to actions of indebitatus assumpsit, yet held that it did apply to actions of account, and that as to such the statute could not be pleaded, and the court of common pleas in Gottam v. Partridge, (4 Man. & G-r. 271,) maintained the same doctrine. These decisions were only in accordance with the exposition of the statute nearly two hundred years before. (Webber v. Tivill, 2 Saund. 127; Farrington v. Lee, 1 Mod. 268.)
The exception in our statute, it will be observed, is not confined to actions of account, but extends to all actions between merchant and merchant concerning the trade of merchandise. The difference, however, between that and the exception in the English statute is immaterial here, as no other action at law than *326 ari action ofaccouht could Lave-been-'mai-ritained bétwéeh these' partriers; The'late case of Robinson's Administrators v. Alexander, in the House of Lords, reported in 8 Bligh, N. S. 352, and also in 3 Clark & Finelly, 717, is instructive'on both'the points we have been-discussing. In- that dase,-the- intéstate-wás' a part owner with' thé"respondent,- Alexander, and- seve'ral1 other persons,- in a-ship-which was sailed for the- joint - benefit of the ówners, and-of which the intestate was'-the husband'and manager. His management had continued frOm 1799; till 1812". There were also other mercantile dealings and accounts between the parties. But no entry appeared- in thé'inté'átát'é’-s books, nor was any evidence'given- of any dealings'between' him-arid the respondént -afteir 1812. The intestate diéd'-in-182!, - the' bill was filed in 1826. The defendant- and" intestate both rfesided in London, and were in-habits of intimate'acquaintance arid friendship with each other. It appeared1 that an account was entered On the books of the intestate with the respondent; -Which account-was open and unsettled, but which on being added' showed' a' balance due from the intestate to Alexander, the respondent; On the- 1st of Map, -1812, of. ¿6950, It whs- pr'ovedr that in- the year 1820, while' the respondent was abróadj his bfótbéífih-láW' had'' frequently called on the intestate’ for a- settlement of the' account' in question,.-and that he always' evaded' the' subject;--but’never' iritirtiated that- he was not indebted- tb the" respondent1; Or ariy' thing to that effect. The vice-chancellor had ordered an account. When thé- case carné up on appeal to the House- of Lords, the' lor'd chancellor (Brougham) moved its- pbstporiément, in- brd'er' to consult with the- judges' in regard- to the- exception in- the’ statute of limitations, and on a- subsequent- d’áy delivered' his: opinion, which was concurred in by the' court; 1st: That the' lapáe of time did not, under the proofs; authorize' the' court- to presume satisfaction br' payment, and' 2dl That1 the statute of limitations Wás-no bar,, ás the casé W'aS- within' the exception1 in relation to mercharits’ accounts:-
This case is a- difeet authority, not- only as to- the’ construction of the exception- in- the statute, but- also ori-' the other question, whether an action of áccount would lié between partners, fot the *327 question of the statute of limitations could have arisen only on that assumption.
There were several cases cited in the argument from the Virginia and Kentucky reports, to show that the exception in the statute does not apply to mutual accounts between partners, but. only- to dealings of the firm with other mercantile houses, such as Coulter v. Coulter, (1 Rob. Virg. R. 88,) Lonsdale v. Brasluor, (3 Munroe, 330,) Patterson v. Brown, (6 Ibid. 10.) The opinions expressed in these cases all rest on a dictum reported in Bridges v. Mitchell, in Bunbury, 217, where a bill for an account by one. partner against another was dismissed on the ground of the staleness of the demand. The reporter adds, “ the court seemed' to think that this was not a merchant’s account within the statute of limitations; these persons, i. e., partners, not dealing as merchants with one another, but as one merchant with others, but gave no opinion on this head, but allowed the plea on the other.” So that the doctrine in support of which the case is quoted in several elementary writers, and in judicial opinions, rests upon the belief of a very inaccurate reporter as to what the judges seemed to think on the point, and not upon what they actually decided: If, however, one of two partners of a mercantile partnership may sue the other in an action of account, because they are merchants dealing with one another as such, they must by the same rule be held to be merchants within the exception. They cannot sustain the action because they are merchants, and be excluded from the benefit of the exception because they are not merchants. If such an action should be brought, and the statute of limitations pleaded by -the defendant, to which the plaintiff should reply the exception in the statute, the replication could not be held bad and yet the action be sustained. The same rule of construction must obtain in both cases.
The decision in Robinson v. Alexander is certainly at variance with the construction given to this exception in several previous cases in England, which advanced the doctrine, that merchants’ accounts, after six years’ total discontinuance of dealings, are as much within the statute of limitations as any others; and that the only difference between them and the accounts of other' *328 persons is, that a continuation of the accounts within six years will prevent the statute from running against the items of an older date. Such were the cases of Welford v. Liddel, (2 Ves. Sen. 400,) Martin v. Heathcote, (2 Eden. 168,) Barber v. Barber, (18 Ves. 286,) Ault v. Goodrich, (4 Russ. 430;) and even since the decision of Robinson v. Alexander, Vice-Chaneellor Wigram, in the case of Tatem v. Williams, (3 Hare, 347,) seemed to consider the question as still unsettled, and remarked that there was high and direct authority in that court that a court of equity will not, after six years’ acquiescence, unexplained by circumstances, or countervailed by acknowledgment, decree an account between a surviving partner and the estate of a deceased partner, although he admitted that the authority of Barber v. Barber, and the other cases which we have cited above, was much shaken by the observations of Lord Brougham in moving judgment in Robinson v. Alexander.
If we turn to the reports in our own state, we shall find but few cases, and those few to be any thing but satisfactory. In Ramschander v. Hammond, (2 John. Cases, 200,) decided in 1807, the supreme court held that the same construction must be put upon the exception in our statute that was given to the English statute in this respect, that it must be confined to open or current accounts which directly concern trade, and not to accounts stated, or to liquidated demands, or bills or notes which are only traced up to the trade of merchandise. Coster v. Murray, decided by Chancellor Kent in 1821, (5 J. C. R. 531,) although generally referred to as a leading authority on this point, does not reach it. The learned chancellor, it is true, went into an examination of several of the English authorities, some of which we have referred to, and remarked that, assuming the case before him to be one that concerned the trade of merchandise, he should rather be inclined to think that the statute was well pleaded, and that the case before him did not fall within the exception. “But,” he added, “it is not necessary to give any decided opinion on the question, because the case does not require it, as it seems not to be a case of mutual accounts, and so not within the exception.” He had previously *329 remarked that it was not yet decided in this state whether some part of an open current account must fall within the six years to bring it within the exception, that it was only settled that if part of an open current account be within the six years, that part draws after it the articles beyond' six years, so as to protect them from the statute. That such is the law with regard to all mutual accounts, whether mercantile or not, appears by many adjudged cases; see particularly Kimball v. Brown, (7 Wend. 322,) Chamberlain v. Cuyler, (9 Ibid. 126,) Sickles v. Mather, (20 Ibid. 72.) When Coster v. Murray came before the court of errors, (20 John. 576,) Ch. J. Spencer considered the question still an open one, but one not necessary to be then decided} because there was no mutual dealing between the parties, and, on the part of the respondent, no account at all.
The question was again considered by Chancellor Walworth in 1847, in Didier v. Davison, (2 Barb. Ch. R. 477,) in which he referred with approbation to the late English cases of Inglis v. Haigh and of Cottam v. Partridge, as having placed this much contested exception upon a ground capable of a rational application. But he considered the law to have been settled by Chancellor Kent in Coster v. Murray, that the exception in the statute does not apply where all the items of the account on both sides were more than six years before the commencement of the suit, and he therefore held that the statute was a bar in the case before him. That suit, as appears by the report in 2 Sand. Ch. R. 61, was brought to recover an indebtedness arising upon bills of exchange and a joint shipping adventure. As to the bills of exchange, the exception clearly did not apply according to Pamschander v. Hammond, and for aught that appears there were no mutual dealings in relation to the joint adventure. The account may have been all on one side, as in Coster v. Murray, so that it cannot be held to be a decisive authority that, in suits upon open accounts respecting mutual dealings between merchants, or between merchants and their factors, the statute of limitations is a bar, if there is no item of account within six years. Were we to express an opinion on the point, we should say, that applying the bar of the statute to cases of *330 mutual accounts between merchants, unless those accounts have been continued down within six yearSj looks very like a. judicial repeal of the statute. This construction has been given, as we have seen, to cases of mutual dealings: between others than merchants, and to apply the same rule to cases within the exception that is applied to those which are without it, does in effect nullify the exception.
We may remark, in passing, that the. revised statutes have settled the question in all cases in which the-right of action accrued after they took effect, i. e., after January 1st, 1830.
The 23d section of the statute of limitations, as found in 2 R. S. 296, places all' actions brought to recover any balance due-on mutual, open, and current accounts on the same footing, and provides that the cause of action shall be deemed to have accrued from the time of the last item proved in such account. The same provision is substantially incorporated in the code of procedure, § 95.
The present case, however, is governed by the law as it existed previous to the revised statutes. If it is a case in which courts of law and equity had concurrent jurisdiction, then it is expressly excluded from the operation of those statutes by section 45, and if it be a case of exclusive equity jurisdiction, the ten years’ limitation provided by the fifty-second section, is prospective entirely, and in terms applies only to cases where the cause of action should thereafter accrue. Besides, it is a general rule that a statute-affecting rights.or liabilities should not be so construed as to act on those already, existing. (Johnson v. Burrell, 2 Hill, 238 ; Dash v. Van Kleek, 7 Johns. 477.)
We are however-relieved from the necessity of pronouncing upon these vexed questions in the case before us. All the arguments and authorities on the subject of the statute of limitations have proceeded on the ground of this being a simple bill for an account, and were it to be viewed only in this light, we should be of opinion that even admitting that the statute does not operate as a fiat bar, and that the case is one of exclusive equity jurisdiction, the bill ought to be dismissed on the ground of *331 lapse of time. The parties complaining have lain by for ’upwards of eighteen years from the-death of the intestate, before they filed' their bill, and although bills' have frequently been sustained after a longer period, where-the apparent laches were excused, and the circumstances where- süch as to render it not inequitable to call the defendant to account, notwithstanding the lapse of time, yet w'e think-' that the plaintiff has- not sufficiently accounted for his-neglect, and if nothing had .transpired, and no’ account had been-rendered, the plaintiff could not escape from’ the application of the rule' adopted by courts of equity in relation to stale demands.
But in truth this is not' merely a bill:for an account;, except- as to the matters not embraced- in the account of September, 1826. It admits and charges that an account had'been rendered-, and a great part of the bill is devoted to charges of frauds alleged to have been committed by the defendants, some of them said tobe apparent on the face of the account,.but others-so'artfully concealed' by the form in which they are put, that they cannot be fully detected even by a minute analysis.
The defendants, on the other hand’, insist- that the’ account having been acquiesced in upwards- of fifteen years after' it was’ rendered, must be deemed a stated account, and that it cannot-now be impeached for error of mistake appearing, on its-face, nor for any frauds; errors, or mistakes, unless they are distinctly charged in the bill, and are such as have not' been and with reasonable diligence could not have been discovered within six years before it was filed. If the' account of Sept. 27, 1826,- is, in truth, a stated account, then the position contended for by the defendants is unquestionably correct. It is unnecessary' to refer to the numerous authorities which might be quoted in’ support of it. Many of the cases on this point are collected in 2 Story’s Eq. Juris. §' 1521, 1521 a, and notes; also 1 Ibid! § 528-526:
Two' questions then present themselves:
I. Is the account of Sept. 27th, 1826, to be deemed’a stated account?' and’if it'is, then,
*332 II. Has the plaintiff succeeded in impeaching it on the ground of fraud, or mistake, within the rule just laid down ?
1. There were several objections taken by the counsel for the plaintiff to the account in question being Jreld a stated account. It was contended, 1st. That it was not a full and complete account — that it was merely an abstract, showing results of the various adventures and transactions of the business, rather than the accounts themselves — that it was deficient in many essential particulars — and was wholly unaccompanied by vouchers. We think it a Sufficient answer to all these objections to say, that the account was acquiesced in as delivered without any objections being made on these grounds which were apparent at first sight. No explanation was asked, no vouchers called for, no deficiencies sought to be supplied. The administrators appear to have reposed themselves entirely on the good faith of the defendants, and to have been satisfied with the correctness of the account. Had objection been then made to it in any of the particulars above enumerated, and the requisite information withheld, the case would have presented a very different aspect. But it is neither just nor equitable, for a party to lie by for a number of years after an account is rendered to him, and then to seek to get rid of such acquiescence by alleging the want of information, which he ought to have called for, and for aught that appears might have obtained, at the time. It was well observed by one of the counsel for the defendants, that the very object of pleading a stated account is to be saved the necessity of proving its correctness and completeness. If these are first to be proved, the question whether it is a stated account or not, or whether it has been acquiesced in, is entirely unimportant.
2. It was next objected that one of the administrators was a female, entirely unacquainted with accounts, and incapable of understanding them, and that the other administrator was a friend and nephew of Mr. Astor. The administratrix,-however, was legally competent to exercise the office, and fully as capable of understanding the account as most men unacquainted with mercantile affairs and who have not made the subject of accounts their study. In a large portion of mercantile transactions there. *333 are many questions continually occurring, which the parties interested are unable to solve without the aid and assistance of others. This very subject of accounts, we have seen in the progress of this cause to be one of extreme difficulty, often presenting questions which tax the powers of our most intelligent and experienced merchants, and there are few estates of any magnitude, especially where they involve the settlement of partnership accounts, which the executors or administrators, however intelligent, can safely manage or settle without the aid of lawyers and professional accountants. To make the fact therefore of an administrator or executor-being a female a reason for keeping an account open, and subjecting the parties who might have had dealings with the testator or intestate to the liability of being called on affirmatively to establish its correctness after the lapse of many years, would be doing violence to the common sense of mankind. The parties interested in the estate of Mr. Ogden knew, when Miss Ogden was appointed administratrix, that there had been large transactions between him and the Messrs. Astor, and that the accounts -were unsettled at the time of' his death. They also knew her qualifications for the office. If she has pursued a course with regard to this account which renders it a stated account, the plaintiff, her successor, is precluded from denying the legal effect of her conduct in this respect, simply because she was a woman unacquainted with accounts.
Neither does the fact of Ehninger’s relationship to Mr. Astor afford any reason why the case should be excepted fr.om the rule applicable to stated accounts. His relationship was well known to the parties interested in Mrv Ogden’s estate at the time he was appointed. He undertook the office, not on the suggestion of the Messrs. Astor, but at the solicitation of the Ogden family. We may reasonably suppose that he was selected by them in consequence of his knowledge of the Canton trade, his general intelligence, and unblemished integrity. No fraud or collusion has been charged upon him. The only objection is, that he so far confided in the accuracy of the account as - presented, that he deemed it unnecessary to enter *334 into .a minute examination, as it .showed, so large a. balance against .Mr. Ogden. Whether he was .right or wrong in ,this, the fact .is clear that he did acquiesce .in. the .account, and as far as he is concerned it is a. stated account.
It .-is said, however, that .admitting■ the account,.,and the papers accompanying it, would have been sufficient, if they had been .delivered to Mr. Ogden himself, and his.acquiescence, notwithstanding its defects,, would have given to it the character of a stated.account; yet that the relation of the .Messrs. Astor to the representatives of Mr. Ogden .was widely .different — .that they were not dealing at .armS-length wi.th the administrators, as they would -have been with the. intestate — rthat, ,a's surviving partners, the Messrs. Astor became .trustees for the representatives .of Mr. Ogden, and that the highest degree of good .faith, and the. fullest information, are required, .from a trustee to his cestui que trust.
It-is undoubtedly .true, that .the Messrs. Astor held a different relation to the administrators, from that in which. they stood towards Ogden. He was,.personally .acquainted with-many of the transactions involved in, the account, .was aware of the..course of business, of the state-of. the markets,, and of most of. the particulars necessary to be known in order to judge of the .correctness of the account. . He was, moreover, a partner, ,and had he been here, would,.as a matter of course, have.had. access to the books and papers and entries in relation to the business. His administrators,: however, were ignorant of many of. the particulars, and were obliged, from the necessity of the case, to rely in a great degree, .if not entirely, on the Messrs. Astor for information respecting .them. The law too had vested them, as surviving partners, with the power of closing up the copartnership- concern, and. the administrators had .no right, to interfere with their management. . It was therefore .incumbent on the surviving partners to use the utmost frankness, and to make all- the necessary disclosures, to enable- the- administrators to form a correct, judgment as to the condition of the partnership affairs.
We do not .think, however, that.-they were bound, in the first *335 instance, to have .produced .all the.evidence in support of the account, which might have been necessary to substantiate all the items, such as the original-account, .sales, receipts,-statements of weights, quantities, &c.,- &c. .It :is .admitted that the account rendered is wanting in-many-particulars of-.that -kind, not only wanting in the evidence,-but in statements of numerous facts, such as weights, quantities, .and prices, important in determining the accuracy of .the account .presented. .But we.conceive-that it is entirely within, the power of a party,-in such circumstances as-the'administrators -were, to-waive these, particulars or the presentation of them in.separate statements, and either to-rely on. the good'faith, of.dhe. surviving partner, -or on the right and liberty of examining -the original books and.papers in his , possession. And we -see no reason-why a party who thus reposes- on 'another, and therefore makes.no objection to an account rendered,.and asks for no information upon matters in which the papers are-on-their face defective, should not ;be concluded by lapse of time -from objections of this kind,- equally as he would -have been had he acquiesced in the account- after all the particulars had been furnished him.
We fully agree with the .doctrine asserted by the supreme court of -Massachusetts, in Farnam v. Brooks, (9 Pick. 234.)' The bill in -that case-was filed to set -aside-an agreement made between the defendant as surviving partner of one Hubbard,- with his administrators, by which he paid them $60,000 in full of the-claim of -the deceased on the copartnership. The court admits -that trustees, and those who are affected by that-character in a court, of equity, or who.-stand in a-confidential relation towards.the property; and the owner, are obliged -in their, bargain.about the.trust fund, not.onlynot to-misrepresent and not to conceal,.but also to disclose every‘thing known to them,.which, in the imind-of.-a,-prudent man, would be likely to .affect; the bargain. ..But then they .-go on-to-say, “Suppose the subject-matter of the -bargain to be of a complicated nature,.such as an account running through many years and many volumes of books, and relating .to. transactions which -may, in .a measure, have gone out of memory; in such ease, all that fairness requires *336 would seem to be to give information sufficient to lead the party into an inquiry, a willingness to answer all questions put, and a surrender of all materials of knowledge by the seller to the purchaser. The -exhibition of a balance, considerably larger than the sum offered, is, of itself, one pretty strong ground for inquiry, and an intimation of contingencies which may affect the bargain; and if the books or memoranda containing the elements from which the balance is composed, be offered for scrutiny, there seems to be no ground to impute fraud. If the party entering into a contract has the full means of knowledge committed to him by the other party, and does not choose, or neglects to avail himself of them, it “ is his own fault if the bargain turns out unfavorably.”
Now to apply these principles to the case in hand. It is nowhere pretended in the bill that the administrators called on the Messrs. Astor for vouchers or books, or for any explanation of obscurities appearing on the face of the account, and that such vouchers, books, or explanations, or any or either of them were refused, nor is it anywhere alleged that they had not access to all these sources of information. On the contrary,, it distinctly appears, by the testimony of Mr. Ehninger himself, that he had confidence in Mr. Astor, that he did not particularly examine any of the papers delivered with the account current, that he discovered no fraud and had no suspicion of any. The account thus delivered remained unobjected to, and without inquiry from September, 1826, till January, 1841, when the plaintiff demanded an examination of the accounts and papers in the possession of Messrs. Astor, which they at that time refused, supposing that the plaintiff was not entitled to come in and unravel the account at that late period. It appears to us that if. delay in objecting to accounts rendered could ever be considered as an acquiescence, so as to make them stated accounts,- this account is to be considered as such with regard to all the transactions which it represents, and that it cannot, at this late day, be opened, unless it is made clearly to appear that the surviving partners have committed frauds in making it up, and frauds which were not discovered, and with reasonable diligence could *337 not have been discovered until within six years previous to the filing of the bill.
And this brings us to the great question in this cause — are there any such frauds charged in the bill and established by the evidence ?
The bill abounds with specific charges of fraud, the most of them, however, appearing on the face of the account, or which a slight examination would have enabled the administrators to detect, if the facts are as alleged in the bill. But they do not come within the rule of law applicable to this case, and would not of themselves authorize the opening of the account.
There is one charge, however, of a different character, on which considerable testimony was taken, and which was also the subject of extended remark by the counsel on both sides. It demands, therefore, a careful investigation. We allude to the credit given in various account sales for the proceeds of merchandise received from Canton and shipped from New York to other ports.
By virtue of their general authority as partners, the Messrs. Astor, perhaps, were authorized to ship to other ports for sale, any of the property sent by Ogden from Canton, whenever such shipment might be deemed advantageous to their common interest. But on the 2d of March, 1819, the Messrs. Astor write to Mr. Ogden as follows: — “ We regret to say that we have not been able to make up the account sales of any one voyage in which you are interested; this is owing to our having shipped off the property to different places, say the West Indies, New Orleans, &c. To avoid this for the future, we propose that when we ship any thing, to ship it on our own account, and to give credit at the price and terms as we sell to others. We ship, as it sometimes relieves the market somewhat, and occasionally gives us some dollars.”
This proposition, at first blush, was entirely in the Messrs. Astor’s favor. The motive for sending abroad was manifestly to obtain a better market; it was only when an article could not be sold to advantage in New York, or when it could prob *338 ably be sold at a greater profit abroad, that it would be shipped. In such cases, they propose to credit the partnership with the price at New York, and to take to themselves the gain or profit to be derived from the shipment. As, however, the object in view was stated to be the early closing of the different adventures, and as shipment to another port is always attended with some additional risk, it might have been the interest of Mr. Ogden to assent to the proposition. He did so assent. On the 3d August, 1819, he writes to the Messrs. Astor, acknowledging the receipt of the letter of 2d March, and of several other letters, and says, “ that he takes note of their contents, to which he shall pay every attentionthe usual mercantile method of assenting to the propositions or requests contained in the letters of a correspondent. Had he not acquiesced in the proposal, it would have been incumbent on him to have expressed his disapprobation and rejection of it. But not having done so, he must be deemed to have assented, and his assent related back to the time when the proposal was made.
Simultaneously with the sending of this proposition, we find in the account sales of the cargo of the “brig Seneca, 3d voyage,” under date of March 1st, 1819, after the name of the purchaser, “ J. R. Yalk, Charleston,” for the first time, the words or abbreviations,.“our acc’t.” The same words “our a/c,” or o/a appear frequently afterwards, though not invariably, in the same account, after the names of purchasers out of New York, and also in various other account sales subsequent to that time. Several witnesses have been examined as to the meaning of this abbreviation in mercantile accounts, and among them William Gr. Bull, Charles H. Hall, William F. Cary, and John J. Boyd, all persons of large experience in mercantile matters, and they all state that these words or abbreviations, “our a/” or “o/a,” imply that the parties using them had assumed the goods as their own, and that the shipment was made solely for their individual account. Mr. Boyd states that where the name of a foreign consignee, with the result of the sale abroad, is stated, he should understand the terms “our a/” to mean that such sum is assumed by the person rendering the account, and *339 guaranteed to tbe persons interested with him. But it was not pretended by the counsel for the defendants that Messrs. Astor did intend to guarantee the sales abroad, or that they give credit in any instance for proceeds of sales, except when they were actually remitted to and received by them. Nor did the counsel for the defendants seriously press such a construction on the court; on the contrary, it is entirely inconsistent with all their evidence and argument on the subject. All the witnesses, however, agree in this, that the more usual mode for a merchant to state the fact that goods belonging to a joint adventure were taken to his own account, would be to insert in the account sales his own name as purchaser, and the price of the goods where he so takes them; and there are frequent instances in the account sales where the name of J. J. Astor & Son and the prices are so entered.
Roberts, the general manager of the mercantile business of the firm, during the period of many of these transactions, and the principal witness for the defendant, gives a very different explanation. He denies that any goods shipped to other ports by the Messrs. Astor, to which these abbreviations are affixed, were taken to their separate account. He says that such shipments were all on account of the joint concern, and were always entered on the books as a shipment to the merchant abroad; ‘our acct. of goods;” the “our a/c,” he says, “is an abbreviation of the style in which the shipment was kept of our “ acct. of goods;” that is, if we understand him, when Messrs. Astor made a shipment of any of these Canton goods to another port, they charged the goods on their book to the consignee, entitling or giving to the entry, the heading, “ our account of goods.”
As the books were not produced, this statement as to their contents was not perhaps strictly admissible, but considering the importance of these entries to the question before us, and also to the question of the debentures, which we will consider hereafter, it is surprising that they were withheld. They were, we infer from other parts of his testimony, the books of John Jacob Astor & Son, used in their general business, and not the books *340 exclusively of the joint concern. Now it appears somewhat extraordinary to us, that the Messrs. Astor should in their own books use the term, “oür a/c” to designate a shipment, not on their own account, but on the account of themselves and a third party, and that this term should be applied to a portion only and not to all the shipments similarly circumstanced. All the goods in question belong to the joint concern. They are shipped to different ports, some shipments are entered as on our a/c, others not.
The “our a/c” does not designate that the shippers take them to their own account, but that they are shipped on joint account. Why then was it placed there? We are now referring to the entry made by the shippers in their books at the time of the shipment. But if the term our a/c has no meaning on Roberts’ statement in the account of the shipment opened with the consignee, it is equally unmeaning in the account sales rendered to the other partner. Here is an account rendered by two partners to a third, of sales of goods owned by them in common. In some instances, opposite to the name of the purchaser or consignee, is appended the term “our a/” or “o/a,” meaning, as admitted by all, our account. Mr. Roberts says, “our a/" means not the account of the parties rendering the' account, but of the three. Do not all the goods belong to the three ? Where then is the sense or propriety of affixing the term at all, or why to some and not to others ?
It is said, however, that if Messrs. Astor had assumed these goods, their name would have appeared in the account sales as purchasers, as in some other instances. Such it appears by the testimony is the usual but hot the invariable mode. Mr. Bull, on his cross-examination, states, that whether the name of the foreign merchant would appear in the account sales, rendered of not, would depend on the accountant who copies the entry from the journal; for instance, an entry of this description: “Shipment for our account to J. Bingham, Dr., To sales per Seneca” for such and such goods, the clerks might copy it verbatim, and do what is, frequently done in such cases, or he might say, “ by A. B. & Co.,” (the -party shipping the goods) “taken to account.” *341 Either of these modes is justifiable and common. It was then neither an unmercantile nor uncommon method for the Messrs. Astor to enter, in the account sales rendered by them, as to the goods which they had taken to their own account, the name of the foreign merchant, with the addition of some terms or words to indicate that they had assumed them for their own account. But the fact that the net proceeds of the sale abroad, and not the market-price at the time of shipment, is credited in the account sales, might be considered as decisive the other way, were. it not that Roberts himself states that, in the first instance, the market-price at New York at the times of shipments was always inserted, and in the account sales of cargo per ship Enterprize, first voyage, there is an entry of a consignment to Wells, Williams & Greene, at Havre, in which the market-price at New York is credited in pencil, and Mr. Roberts informs us that the same entry was made in the account of the shipment.
The entry, then, was perfect and mercantile, and if the plaintiff’s construction of “ o/a” is correct, the use of the term as in the instance referred to would have entitled the Messrs. Astor to have retained the net proceeds at the foreign ports if the consignment had turned out profitably, and to have accounted for the goods at the market-price in New York at the time the goods were shipped; but according to Roberts it was entirely unmeaning. We confess that we cannot, under the evidence, arrive at any other conclusion than that insisted on by the counsel for the plaintiff, to wit, — that the “ o/a” or “our a/,” was designed to indicate that the goods to which it referred were shipped by the Messrs. Astor on their own account, that they acted forthwith on the proposition contained in the letter of 2d March, in anticipation of Mr. Ogden’s consent, and thus showed their willingness to be bound by it on their part from that time. The peculiar form of the entry may have been owing to the uncertainty as to whether he would accede to it or not; but when he had done so, they could not afterwards recede from it or charge the firm with the net proceeds abroad.
- We think, too, that it was a very erroneous construction of the letter of March, 1819, to suppose, as the Messrs. Astor evi *342 dently did, and as their counsel contended, that it was optional with them to apply it to a portion and not to all the goods which they should ship to other ports. The proposition was a general one, and was to take effect as to all goods shipped abroad, or to other ports in this country; and there is no authority expressed or that could be implied, which would authorize them to take one portion to their own account and refuse another. The agreement was valid and binding, and compelled the Messrs. Astor to credit goods at New York prices whenever they shipped them to other ports. It was proposed, when adherence to it held out the prospect of benefit which they were desirous of retaining, it cannot now be repudiated when it has turned out disastrously.
But might not this violation of the rights of Mr. Ogden or his representatives have been discovered before? and at the time of the rendition of the accounts ? Had not the former administrators all the facts before them, in relation to this point, as well as the plaintiffs ? Had they not, as well as he, the letter of March, 1819, and did not the accounts themselves show that the proceeds of goods shipped from New York to other places were credited, not at the New York, but at the foreign prices ? It cannot be doubted that the plain import of the account sales of the goods referred to is, that the net proceeds abroad, and not the prices at home, are credited, and that the persons residing out of the city, whose names appear under the head “ To whom sold,” were merely the consignees and not the purchasers. There is often an interval of from two to three years, and sometimes more, between the date of the shipment and the time when the proceeds of the sales became due. The caption in several of the account sales of the names of the recipients of the goods is, “ To whom sold or consigned,” and at the foot of account sales of cargo per William & John, sixth voyage, is this remark : “ Unsold of this cargo shipment to Havre, per Governor Winslow and Cadmus, in December, 1823, 284 chests, &c., of tea.” So that it was hardly possible that any person on an examination of these accounts could imagine that the parties abroad were the purchasers and not the consignees of the goods.
*343 But there is no evidence that the important letter of March' 2d, 1819, was ever communicated to the administrators, or that they had any notice of so vital a modification of the original agreement. It appears by the testimony of Mr. Ehninger that' the original agreement was among the papers delivered by the. Messrs. Astor to the administrators, and by its provisions they would of course be governed, unless they were informed that they had been altered; and according to them, the right of Messrs. Astor was undoubted to ship property where they thought it would be advantageous for the concern, and Mr. Ogden and his representatives would have to abide the result of those shipments, if made in good faith, however unfortunate the results might turn out.
But there was nothing in the account itself, or in any of the papers accompanying it, calculated to put the administrators on. inquiry in this respect. On the contrary, the delivery of the original agreement in connection with the account, and without notice of any modification, was well calculated to prevent inquiry into, or even suspicion of, any modification. It is true that the letter of March, 1819, was among Mr. Ogden’s papers , received by the administrators from Canton, but amidst such a mass of papers it might easily have escaped their notice. The relation in which the surviving partners stood to them was, moreover, of so confidential a nature, that, in the language of Chief • Justice Parker, in Farnam v. Brooks, they were obliged not only not to misrepresent and not to conceal, but also to disclose every thing known to them which in the mind of a prudent man would be likely to affect the -question of the accounts; and this letter had, such an important bearing on the question of shipments to other ports, that it was the bounden duty of the Messrs. Astor to have directed the attention of the administrators to it. This it is not pretended they have done; and we do not see how they can escape from the consequences of their neglect. Neither is there any evidence that the administrators were ever aware of the letter, or had notice of its contents from any quarter. All the probabilities are the other way. If they *344 had such notice, it was for the ’ defendants' to have proved it affirmatively.
Thé counsel for the defendants commented at large upon the letters of the plaintiff to Mr. John Jacob Astor in 1839 and 1840, as evidence that the plaintiff must have examined these accounts for a long time previous thereto, and that he had acquiesced in them as correct. Admitting the argument to be sound, and to be fairly deducible from the letters, yet there is no pretence that he was aware, even at the time he wrote those letters, of the modification of the agreement; and any acquiescence, in ignorance of so important a fact, would not be conclusive upon him.
We are of opinion, then, that the joint concern is entitled to be credited with the market value at New York, of all goods shipped therefrom to other ports, whether foreign or domestic, after the 1st March, 1819, at the time of such shipments respectively, instead of the net proceeds of those goods in the ports to which they were sent; and that, under the rule of law herein-before laid down on that subject, and for thfe reasons herein-before stated, the account ought to be opened for that purpose; the burdenof proving the value in New York being of course thrown upon the plaintiff.
We must except, however, from the operation of this rule, all those shipments to Europe which appear,to have been made after notice to Mr. Ogden, and those shipments also of goods which were purchased at Canton by Mr. Ogden, with a view to being sent to Europe from this country. An instance of the former kind is to be found in the letter of the Messrs. Astor to Mr. Ogden, Dec. 13,1821, in which they express their intention to ship 35,000 pieces nankeens to Gibraltar, with 14,000 pieces, the balance of the Enterprize’s' cargo, and which latter are accounted for in the account sales of the Enterprize’s cargo, second voyage. An instance of the latter kind is to be found in the letter of Mr. Ogden to Messrs. Astor, of June 20, 1821, in which he says, that a part of the rhubarb shipped at that time by the Henry Astor was calculated for the Dutch market, and he advises it to be sent thither without delay. A portion *345 of this rhubarb only appears to have been sent to Amsterdam, and is accounted for in the account sales of cargo, ship Henry Astor, first voyage. And so in all other cases subsequent to 2d March, 1819, when goods were expressly ordered by the Messrs. Astor for the foreign markets, or where they were shipped by Mr. Ogden for New York, with a view to shipment from hence abroad. Such shipments are to be deemed on joint account. The correspondence shows that such were the views and intentions of the parties.
But there is another serious charge made with regard to these accounts, and that is, that the surviving partners received a large amount of debentures on goods shipped by them to foreign ports, and also on goods sold by them at short price; that is, reserving the debentures to themselves, but that the accounts of sales were without particulars or details of the debentures, from which it could be ascertained whether they had been cred.ited or not. The administrators had a right to rely upon the good faith of the surviving partners, that these.debentures had been properly credited. The complainant, however, has shown, as we think conclusively, from the custom-house books, that debentures were received by the surviving partners to the amount in the whole of $45,674.60 which are not in terms credited in the accounts; that is to say, in every account sales some debentures are credited at the foot of the accounts, but the amounts actually received by the surviving partners exceed by $45,000 and upwards the amounts so credited.
For the purpose of rebutting this proof, the defendants relied upon Mr. Roberts, and he was examined particularly as to the debentures upon these various sales, embracing the sales of many cargoes, and of a great variety of goods spread through several years, This witness undertakes, upon an inspection of the schedules introduced by the plaintiff, showing the debentures received by the Messrs. Astor, and of the account sales, to state from recollection whether or not the debentures had been credited, and whether the goods were sold at long or short price. He had memoranda in his hand,* taken, as it appeared, from the *346 books of tbe defendants. The books themselves, however, were not produced; but the defendants relied entirely upon the parol testimony of the witness, who swore positively as to each and every alleged omission to allow the debenture, on which he was examined by the defendant’s counsel — that he had a distinct and perfect recollection of the shipment, and that the debenture was allowed therein; and he explained in many instances, from such recollection, as he alleged, how he arrived at this result by the process of somewhat complicated statements of accounts.
He also stated, with regard to some sales that took place nearly eight and twenty years before his examination, that from his recollection of the value of the goods at the time of the sales, he could tell whether they were credited at long or short price. In this way, he undertook to swear in numerous instances where it appeared that the debentures Were not credited in form and in terms, that the goods were credited at long price, and that consequently the debentures had no bearing on the account sales. On all these points, his recollection was so vivid and distinct, that under the rules of evidence the production of the books at that stage of the case probably could not have been insisted on.
His cross-examination, however, which, as well as his direct examination, was conducted with great ability, considerably weakened the force, and even the credit of his previous testimony. His knowledge of the value of goods in the New York market did not enable him in many instances to answer the inquiries of the plaintiff’s counsel as to whether certain sales men-, tioned in the accounts were credited at long or short price, and he expressly admitted, in numerous cases, that he could not, from' recollection, upon an inspection of the account sales, tell whether the goods were credited at one or the other, or whether the debentures were credited or not. Besides, we are unable to reconcile the reason which he gives in the cases of consignments to foreign ports on joint account, for the absence of a credit in terms of the debentures, to wit, that the goods in such cases were credited on shipment to the account sales at long price, with what he afterwards says with regard to the form of keep *347 ing the accounts. “ The form of keeping the accounts,” he says, “ in the ledger, as, for instance, the consignments to commission houses resident on the Continent, were charged to an account of goods in the hands of the different parties, and the goods were always entered at the long price then current in New York. In shipments to foreign ports, the goods at the time of the shipment were entered at short price, and remained in that shape on the books till the account sales were received from the different parties.” We can see a reason for this course. In consignments to domestic ports, for home consumption, the goods would be charged at long price, for the consignees would not be entitled to drawback; and in consignments to foreign ports, they would be charged at short price, because the party here would, on exportation, receive the drawback; and we have no doubt that this was the course adopted. Why, then, in the cases to which the witness has testified that the goods were credited at long price, were they so credited ? No reason is given by the witness, but the books are withheld, from which it would appear whether the debentures were credited' or not, and we are asked to rely entirely upon his recollection in the premises.
We think this is asking too much. The learned counsel for the defendants would hardly have ventured to rely on such evidence before an intelligent jury, and we, sitting as jurors, feel constrained to say, that the evidence of the debentures having been credited, even in those accounts to which Roberts has testified, has failed to produce conviction in our minds. Taking into consideration the evidence which the defendants had it in their power to have adduced, and comparing it with that which they have brought forward, we are led to doubt rather than confide in the accuracy of Mr. Roberts’ memory. There is, moreover, no evidence whatever as to the debentures on several of the sales. The clerks who made out the account sales of several of them, it is true, are dead, but Mr. Merle, who succeeded Roberts as manager, and continued in that capacity till after the death of Mr. Ogden, is still living, and was examined as a witness in the cause. Besides, the shipment *348 accounts, to which Roberts testified so particularly, we must presume are still in existence, and would show in every instance of shipments abroad by the surviving partners, whether the debentures had been credited or not. We think, therefore, that the defendants have not answered the prima facie evidence adduced by the plaintiff on this subject, and that, as the case now stands, we must consider the fact as established, that they have omitted to credit the partnership with debentures to a large amount; sufficiently large to justify the court in opening the account, even at this late day, for the purpose of inquiry and proof.
• This omission of credit would not be easily discovered. The accounts sales purport to give credit for debentures received, and the fair inference is that all the debentures were credited. The fact that such was not the case was only discovered by an examination of the custom-house books, and no laches, we think, 'can be imputed to the administrators, for not having sooner made the discovery.
Upon these two grounds, therefore, 1st, thát the joint concern ought, to be credited with the market-prices at New York of' goods shipped to other ports after the 2d March, 1819, at the times of such shipments respectively; and 2d, that the debentures on goods exported' to foreign ports, amounting to a large sum, do not appear to have been credited, we think that this account ought to be opened.
It would not be proper, however, at this distance of time, to open the account generally, but it may be opened as to frauds or mistakes distinctly charged in the bill, and which, from the evidence before us, we are satisfied ought to be corrected, or at least made the subjects of further examination; and the inquiry need not be confined to such frauds or mistakes as would have been requisite to open the account in the first instance. When once opened, the extent to which it may be opened, and the particular items or charges which may be impeached, are matters resting in the discretion of the court. (1 Story Eq. Jur. § 523.) This will impose on us the necessity of considering the *349 other objections to the account taken in the_ bill and relied on upon the argument.
The judge then examined nine several objections to the account, which it is deemed unnecessary to insert, with the exception of the fifth, eighth, and ninth.
Y. The next transaction complained of is as to the proceeds of 19 bales of cloth. It appears that 24 bales of cloth were in August, 1823, shipped from Hamburgh to New York for the Canton market, in consequence of a suggestion from Mr. Ogden that they might be profitable. They arrived at New York in October of that year, and 4 bales were sold to Mr. Roberts in the following month. In the spring of 1824, after the news of the death of Mr. Ogden had been received here, one bale was sold at auction, and the residue, 19 bales, were taken by defendants to their own account, at a valuation apparently corresponding with that fixed by the sale of the one bale. The result was a loss to the joint concern of $2000 or thereabouts. The 19 bales were then shipped to Canton by defendants, according to the original intention of the parties, and resulted in a net profit of $2600 and upwards.
The defendants undoubtedly proceeded on the principle contended for by their counsel, that Ogden was not a partner, but only an agent, paid for his services by a portion of the profits of the business. It was not argued by the defendant’s counsel that the transaction could be defefided as between a surviving partner and the estate of a deceased partner. The relation in which the defendants stood as survivors to the estate of their deceased partner required them to dispose of the property to the best advantage. In Crawshay v. Collins, (15 Ves. 226,) Lord Eldon laid down the position that surviving partners, if they did not choose to settle with the executors of the deceased partner as to the terms upon which his beneficial interest in the stock is still to be continued, could not take the partnership property, do what they pleased with it, and compel the executors to take the calculated value. And he very forcibly asks, if *350 the implied obligation in such a case is that the surviving partners are to use the property for the benefit of those to whom it belongs, where is the hardship ?
Admitting that the Messrs. Astor might have sold the partnership property, on the dissolution by the death of Mr. 0., it does not follow that they could become the purchasers themselves, and continue the adventure on their own account. Having elected to send the goods to Canton, they must be deemed to have elected to continue the original adventure. They must therefore account for the net proceeds of these 19 bales in Canton.
VIII. As to the proceeds of the shipment to Canton by the Beaver, and also the proceeds of the outward cargo of the Henry Astor, third voyage, not remitted .in the homeward cargo, and all other funds and property remaining in Canton at the time of the death of Mr. Ogden, and not included in the account rendered to the administrators. As to all these matters, the bill is strictly a bill for account. Had they constituted all the transactions between the parties, and had the administrators, with the knowledge brought home to them that these funds and property were outstanding, lain by from 1826 to 1812 without asking for any account of them, we should hold, on the authority of the cases before referred to, that they were not now entitled to an account. But it does not appear that the administrators’had any knowledge of these outstanding funds. The account rendered was silent on the subject. They might, no doubt, by a careful and minute examination of the accounts rendered, have discovered that there was some property still at Canton undisposed of or unaccounted for. But that was not sufficient. Even in dealings between two merchants jointly interested, when they render to each other mutual accounts, it is proper and usual to state what property remains on hand. "When a factor renders an account to his principal of goods confided to him, the same information is given as a matter of course. But it was especially incumbent on these surviving partners to give to the administrators a full statement of all the property belonging to the joint concern. Good faith, and the *351 relations subsisting between the parties, required it, and we cannot hold the administrators guilty of negligence in not sooner discovering facts which it was the bounden duty of the surviving partners to have communicated to them. They had a right to presume that the account rendered was full and final, and it does not lie in the mouth of the defendants to object that the administrators reposed themselves too entirely on their integrity. There is no evidence that the administrators ever .knew any thing about these outstanding funds and property, or that the plaintiff was made acquainted with the fact more than six years before the filing of the bill. But there is another conclusive reason why an account should be taken of these outstanding funds. It is insisted by the defendants that the closing up of these matters resulted in a loss. It is the more necessary, therefore, for the defendants, that this loss should be charged to the concern, in order to overcome the effect of the alterations we have directed in the previous accounts. Besides, it is all one account. The whole ought to be settled together.
The surviving partners must therefore account for these outstanding funds and property, before the referee who may be appointed, in the same.way in which, under the old practice, they would have accounted in the master’s office; excepting that they are not to be required to prove the several items in the account as though the transactions were recent; but entries in the books, and the papers and vouchers, in the possession of the defendants relating to these matters, are to be taken as genuine and correct in the first instance, without further ffi’oof than the oath of the surviving partner or his clerk or agent, having the management and custody of them, that they are the original entries, papers, and vouchers. They may, however, be impeached by the plaintiff, on competent proof. There are only two points on which it appears to be necessary to give directions at the present time in relation to this accounting.
1. The plaintiff is not to be charged with the cost of the outward cargo of the Henry Astor’s fourth voyage, nor with any of the charges or disbursements of the vessel out, as the purchase of that cargo was not necessary in order to bring the *352 partnership property home. The profit or the loss on that cargo belongs to, or is chargeable on, the defendants alone. But as the homeward cargo was purchased in part with the funds of the joint concern remaining in Canton, and in part with the proceeds of the outward cargo, the net proceeds of the sales of the homeward cargo are to be apportioned between the joint concern and the defendants, according to the amount belonging to each invested in such homeward cargo, and a reasonable freight is to be charged upon the proportion of the cargo purchased with partnership funds.
2. It was^a prudent, if not necessary measure, to send out Mr. Clapp for the purpose of attending to the outstanding partnership property and business at Canton, and his compensation for those services should be borne by the partnership. But the defendants cannot charge against it the amount pa id him for transacting their own business. The gross sum of $5000, and also $450 for his passage from Canton, are charged as having been paid by defendants. An inquiry must be had of the sum actually paid to Mr. Clapp for all his services and expenses. From that sum the commissions which he credited to the defendants must be deducted, and the balance is to be apportioned between the joint concern and the defendants, according to thé services rendered by him to each, including his services in relation to the outward as well as the homeward cargo.
IX. The charges of interest made in these accounts were the subject of extended examination of some of the witnesses, and of much comment on the argument. The questions arising on them, in consequence of the peculiar manner in which these accounts are made out, are difficult and intricate; and, while the plaintiff has failed to convince us of intentional errors committed by charging or not allowing interest, except in one or two cases — as the Rosalie for instance, yet we cannot say that we are satisfied entirely with the explanations of the defendants’ counsel. It is however admitted by them, that the charges of interest in the several adventure accounts are not made with strict accuracy, but are only an approximation to it — and that this is owing to the mode of keeping the accounts, blending the *353 New York and Canton payments together, and seeking to keep a separate account of each adventure.
By the original agreement each party was to render to the other every year a regular account of all their transactions in this business. This would obviously have been in the form of an account current on both sides; one by Mr. Ogden, embracing all the transactions at Canton; and the other by Messrs. Astor, covering all the operations of the joint concern in New York and elsewhere, under their management. Had this been done, many of these embarrassing questions which now exist probably would not have arisen. Instead, however, of pursuing the simple and easily understood method pointed out in the agreement, the Messrs. Astor never rendered such an account at all; but Mr. Roberts devised this mode of'stating the account by adventures of the several vessels separately, with a view, as he says, of showing the result of the whole operations by each vessel as to profit and loss in one view, as he believed that the result would be more easily understood by Mr. Astor, who had a great aversion to long accounts. With how much success his effort was attended we have seen in the examination of these accounts. It was utterly impossible to arrive at entire accuracy on this principle, or to state the actual balance of profit and loss on any one adventure, for the reason that the net proceeds of the sales of the outward cargoes do not correspond with the amount of the cost and charges of the homeward cargoes, so that the 'balances which are made are estimated and not actual balances. The effect of this mode was very unequal upon the interest account. Where the cost of the homeward cargo exceeded the sales of the outward cargo, the adventure lost interest and Mr. Astor gained it; and on the contrary, where the cost of the homeward cargo was less than the sales of the outward cargo, Mr. Astor was the loser in interest, The counsel for the defendants has submitted a paper, from which it would appear that the defendants have sustained a loss of interest, in the statement of these adventure accounts, of nearly $13,000, while the plaintiff insists that the mode of stating the accounts has resulted in this matter of interest greatly to the prejudice *354 of Mr. Ogden’s estate. It is moreover erroneous in principle, according to the testimony of several of the most intelligent of the witnesses, as well as very complicated in its details, and at variance with the letter and spirit of the agreement between the parties. We presume, therefore, that we shall meet the views of both parties, as we know that we shall advance the ends of justice, by directing this account to be re-stated so as to conform to the original agreement — that is to say, by a general annual account .current of the Messrs. Astor with the joint concern, showing all their receipts and disbursements as stipulated for in the original agreement, with annual interest;, such annual account to be brought down to the date of the last item of debit and credit.
The balance which may be found due from either party, to carry simple interest from that date to the time of taking the account.
In this geneial account, the debits and credits other than for interest, are to be taken from the accounts already presented and in evidence, except in the particulars hereinbefore specified, and the defendants excused from the necessity of proving their correctness, unless upon production.and inspection of the books, papers, and vouchers, which the defendants may be called on to produce, or other competent proof, any of such debits or credits shall be found to be erroneous.
A decree will be drawn up in conformity with the views herein above expressed. As in the multitude of questions which have been the subject of examination, some matters may have escaped our attention on which it may be advisable to have the direction of the court in taking the account; either party may suggest such matters on the settlement of the decree. A provision will also be inserted, allowing either party to apply to the court for further directions at any stage of the proceedings. .The question of costs is reserved until the coming in of the referee’s report.